**Deborah YOUNG, Plaintiff,**

v.

**SUFFOLK COUNTY, Suffolk County Department of Social Services, Suffolk County Police Department, Michael Delgado, Joseph Quatela, Raymond L. Young, Raymond M. Young, Defendants.**

No. 09–cv–3325 (JFB)(ARL).

United States District Court,
E.D. New York.

Feb. 11, 2013.

Thomas F. Liotti, Lucia Maria Ciaravino, Law Offices of Thomas F. Liotti, Garden City, NY, for Plaintiff.

Arlene S. Zwilling, Suffolk County Attorney, Hauppauge, NY, Scott E. Kossove, Daniel M. Maunz, L'Abbate, Balkan, Colavita & Contin, Garden City, NY, Michael H. Joseph, Law Office of Michael H. Joseph PLLC, White Plains, NY, for Defendants.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

Deborah Young ("plaintiff" or "Ms. Young"), individually and as the parent

and guardian of Melissa Young, Emmalee Young, and Cecelia Young, brought this action against Suffolk County, Suffolk County Department of Social Services, Suffolk County Police Department, Michael Delgado ("Delgado") (collectively, "County defendants"), Edmund Coppa, Edmund J. Coppa Photography, News 12, Newsday, New York Post, New York Daily News, WCBSTV.COM (collectively, "media defendants"), Raymond L. Young ("Mr. Young") and Raymond M. Young (together, "Young defendants"), and Joseph Quatela ("Quatela"), pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging that defendants violated plaintiff's rights under the Fourth Amendment and the Fourteenth Amendment, and participated in a conspiracy to deprive plaintiff of her constitutional rights. Plaintiff also brought claims for constitutional violations pursuant to 42 U.S.C. § 1982, 42 U.S.C. § 1985, and 42 U.S.C. § 1986. Plaintiff further alleged state law claims of intentional infliction of emotional distress and defamation.

The claims in this lawsuit arise from an incident that occurred on February 21, 2007, in which plaintiff's former husband, Mr. Young, allegedly: (1) trashed plaintiff's residence in Lindenhurst, New York, to create the appearance of an unsafe and unsanitary home; (2) contacted the police and entered the residence with the police without plaintiff's consent or authorization; and (3) invited the media to film the conditions of the home. Plaintiff asserts that the police actions on that day—actions that were allegedly part of a conspiracy among the County defendants, the Young defendants, Quatela (Mr. Young's father's attorney who was present on that date), and the media defendants—violated her constitutional rights and resulted in her losing custody of her three children in Family Court. On May 4, 2007, plaintiff pled guilty to neglect of her three children in Suffolk County Family Court, acknowledging that she suffers from a mental health condition that negatively impacted her ability to care for her children. On January 27, 2010, Mr. Young was awarded sole custody of the children.

The Young defendants and the media defendants filed motions to dismiss plaintiff's amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, on November 2, 2009 and December 4, 2009, respectively. The Young defendants also filed a motion for sanctions against plaintiff and her counsel on November 2, 2009. Quatela filed a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure on December 4, 2009. On April 9, 2010, this Court issued a Memorandum and Opinion (1) granting the media defendants' motion to dismiss in its entirety, (2) denying the Young defendants' motion and Quatela's motion with respect to plaintiff's Section 1983 claims for conspiracy and violation of the Fourth Amendment, (3) granting the Young defendants' motion and Quatela's motion with respect to all other federal and state claims alleged by plaintiff, and (4) denying the Young defendants' motion for sanctions. Thus, as a result of the Court's April 9, 2010 ruling, plaintiff's case was limited to her Section 1983 claims for violation of the Fourth Amendment and conspiracy against the County defendants, the Young defendants, and Quatela. In answering plaintiff's complaint, the Young defendants also brought two counterclaims against plaintiff, for negligence and failure to preserve and maintain property. The lawsuit proceeded to discovery under the direction of Magistrate Judge Lindsay.

Presently before the Court are three motions for summary judgment made, pursuant to Rule 56 of the Federal Rules of Civil Procedure, by the County defen-

dants, the Young defendants, and Quatela. For the reasons set forth below, the Court grants all three motions in their entirety.

First, as to the Young defendants, the Court grants summary judgment on the Section 1983 claims because there is no evidence (1) that the Young defendants were acting under the color of state law when they entered on February 21, 2007, or (2) that the Young defendants conspired with any of the County defendants to violate plaintiff's constitutional rights. In particular, it is uncontroverted that the Young defendants repeatedly contacted the County defendants about inspecting the Nevada Street house prior to February 21, 2007, but that no action was taken. Moreover, it is uncontroverted that the Young defendants did not contact the police for assistance on February 21, 2007 until *after* they had already entered the home. Thus, the undisputed evidence shows that when the Young defendants entered the house on February 21, 2007, they did so without knowing whether the County defendants would in fact enter in a similar fashion and/or on that same day. In short, there is no evidence of state action, or a conspiracy with state actors, by the Young defendants.

Second, the Court grants Quatela's motion for summary judgment on the Section 1983 claims because there is no evidence (1) that Quatela was acting under color of state law when he entered, or (2) that Quatela conspired with any of the County defendants to violate plaintiff's constitutional rights. Specifically, there is no evidence that Quatela was even involved in calling the police to the Nevada Street house on the date of the incident in question. Indeed, the uncontroverted evidence shows that Quatela arrived to the house for the first time *after* the police had already entered and begun to search the premises. Thus, the uncontroverted evidence demonstrates that the police did not enter the home under Quatela's directive, and there was no joint action between Quatela and the police to deem Quatela a state actor for purposes of Section 1983.

Finally, with respect to the County defendants, the Court grants their motion for summary judgment on several grounds. First, the uncontroverted evidence demonstrates that Mr. Young had apparent authority to consent to Delgado's entry and, as such, Delgado's entry without a warrant did not violate plaintiff's Fourth Amendment rights. In particular, it is undisputed that the house was owned by Mr. Young, that his children lived there, and was accessed by Mr. Young on the date in question before the police arrived. Under such circumstances, no rational jury could find that it was unreasonable for the police to conclude that the Young defendants had apparent authority to consent to a search of the house. Second, even assuming *arguendo* that Mr. Young lacked apparent authority to consent to Delgado's entry, Delgado is shielded from Section 1983 liability by the doctrine of qualified immunity. Third, plaintiff has failed to provide any evidence of a Section 1983 conspiracy between the County defendants and either the Young defendants or Quatela. Fourth, plaintiff has failed to point to any evidence of an unconstitutional policy, practice, or custom by the County, or a failure to supervise or train, to support her *Monell* claim.

Also before the Court is a motion for sanctions under Rule 11 against plaintiff and her counsel, filed by the Young defendants. For the reasons set forth below, the Court concludes that sanctions are not warranted, and, therefore, the Young defendants' motion for sanctions is denied.

Finally, the Court declines to exercise supplemental jurisdiction over the Young defendants' state law counterclaims.

## I. BACKGROUND

### A. Factual Background

 The Court has taken the facts set forth below from the parties' depositions, affidavits, exhibits, and respective Rule 56.1 Statements of Facts.[1,2] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any evidence in the record to contradict it.[3]

### 1. The Youngs

Plaintiff and Mr. Young were married on August 11, 1990. (Deborah Young Affidavit ("D. Young Aff.") ¶ 2.) Together, they had three children—Melissa Young, Emmalee Young, and Cecelia Young (collectively, the "Young children"). (County defs.' 56.1 ¶ 1.) Plaintiff, Mr. Young, and the Young children all lived at 239 Nevada Street, Lindenhurst, New York ("the house", "the home", or "the Nevada Street house"). (*Id.* ¶ 2.) Mr. Young and his father, Raymond M. Young, held title to the Nevada Street house in which the family resided. (Pl.'s 56.1 ¶ 2.) Plaintiff had no ownership interest in the property. (County defs.' 56.1 ¶ 6.) However, according to plaintiff, she had "exclusive occupan-

---

1. The Young defendants failed to file a 56.1 statement. A "district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.2001) (citations omitted). Given the fact that the Young defendants' memorandum of law in support of their motion for summary judgment contains a detailed "Statement of Facts", (*see* Young defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Young defs.' Mem.") at 2–5), the Court, in the exercise of its broad discretion, will overlook the fact that the Young defendants failed to file a separate Rule 56.1 statement when moving for summary judgment, as required under the local rules. *See Giliani v. GNOC Corp.*, No. 04–CV–2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 25, 2006) (exercising court's discretion to overlook parties' failure to submit statements pursuant to Rule 56.1).

2. In addition, plaintiff filed the same Rule 56.1 statement with all three sets of opposition papers. Plaintiff's thrice filed Rule 56.1 statement is a single list of material facts to which plaintiff contends there exists a genuine issue to be tried. Plaintiff's list does not separately address each of the 56.1 statements filed by defendants in this case, nor does it respond to the numbered paragraphs contained within each statement with correspondingly numbered paragraphs as Rule 56.1 requires. *See* Loc. R. Civ. P. 56(c). In the exercise of its broad discretion, the Court

will overlook the fact that plaintiff failed to comply with the corresponding numbered paragraphs requirement of Rule 56.1. *See Holtz*, 258 F.3d at 73. To the extent the Court can determine which facts from defendants' 56.1 statements plaintiff meant to contest in her 56.1 statement, the Court will deem those facts disputed for purposes of this motion. However, to the extent the connection between the facts cited by plaintiff in her 56.1 statement and the facts contained in defendants' 56.1 statements is unclear, or to the extent plaintiff fails to respond to certain facts put forth by defendants, the Court will deem such facts undisputed, *Jessamy v. City of New Rochelle*, 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (explaining that failure to respond to or contest facts set forth by moving party in its Rule 56.1 statement constitutes an admission of those facts, making them accepted as undisputed), so long as they are supported by admissible evidence, *see Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003) ("'[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." (citation and quotations omitted)).

3. Although the parties' Rule 56.1 statements contain specific citations to the record, the Court cites to the Rule 56.1 statements, rather than to the underlying citations.

cy" of the home. (Deborah Young Deposition ("D. Young Dep.") at 60.)

In 2005, Mr. Young moved out, but plaintiff and the Young children continued to live in the Nevada Street house owned by Mr. Young and his father. (County defs.' 56.1 ¶ 6.) On October 31, 2006, Mr. Young consented and stipulated to plaintiff taking sole custody of their three children. (Pl.'s 56.1 ¶ 3.)

### 2. Events Leading Up to the February 2007 Incident

At his deposition, Mr. Young testified that, beginning in approximately February 2005, he started having some concerns about the conditions of the Nevada Street house. (Raymond L. Young Deposition ("Mr. Young Dep.") at 9–11.) He was "concerned about the home having no heat, concerned about the condition, concerned about the garbage that was piling up, not piling up, the smell," as well as the complaints that he received from "the neighbor behind, the neighbor across the street, [and] the neighbor across on the other street." (Id. at 14–15.) According to Mr. Young, the house stopped receiving heat and hot water at some point between February 2005 and October 2006. (Id. at 20–21.) Mr. Young testified that, for the most part, he raised all of the concerns he had about the condition of the home during the February 2005 to October 2006 time frame with his lawyer at the time, Quatela. (Id. at 12, 21.) In addition, he claims that his father called the Suffolk County Police Department around Labor Day, in September of 2006, out of "[c]oncern[ ] for the well-being of the children living in the home at 239 Nevada Street." (Id. at 22; see also Raymond M. Young Deposition ("R.M. Young Dep.") at 11–12 (explaining that he called the police about the Nevada Street house sometime during the summer of 2006).) When asked about this call at his deposition, Mr. Young's father testified

that he gave his name to the police and said, "I think my grandchildren could be in jeopardy in the home on Nevada Street and I was wondering if you could go pay a visit, knock on the door, get inside, see what the conditions are like because we haven't been in there in years and we are not allowed in there." (R.M. Young Dep. at 12–13.) He further testified that the police told him they would check out the house, but that he should call Protective Services, which he claims he did, but no action was taken. (Id. at 13–14.)

Mr. Young testified that the first time he called the police about the condition of the home was in late December 2006 or January 2007. (Mr. Young Dep. at 33.) He called the police anonymously, asking them to check on the house and his children. (Id. at 34.) Mr. Young states that the call was made at the direction of his attorney, and that he made no other complaints to the Suffolk County Police Department prior to February 2007. (Id. at 36–37.)

According to Mr. Young, the first call he made to the police department in February 2007 about the home was on February 7th or 8th. (Id. at 38.) Mr. Young testified that, during that call, he told the police "there is something wrong with the house. I'm afraid for my children's [sic] health and wellbeing. Is there anything that can be done?" (Id. at 39.) Mr. Young testified to placing a second call to the police that month, on the 12th. (Id. at 39–40.) When asked what he said to the police during that second call, Mr. Young stated the following: "Can you send somebody by the house? I feel my children have no heat and hot water, and my children are in danger." (Id. at 40.) Mr. Young states that the police went to the house and subsequently told him that they did not see anything, there was nothing they could do at that time, but that they

were going to keep an eye on the house and send another patrol car at a later date. (*Id.* at 41–42.) Mr. Young testified that he also called Child Protective Services ("CPS") on or around the date of his second call to the police. (*Id.* at 40, 42.) When asked about a call that was placed to the police on February 14th, Mr. Young testified that a friend of his—a friend who lived across the street from the Nevada Street house—called to alert the police that plaintiff and the Young children were sleeping in a car at night. (*Id.* at 44–45.) Mr. Young also testified to calling the CPS hotline on that same date, out of concern for the health and well-being of his children upon learning that his father's oil company was unable to put oil in the tank of the house, thereby leading Mr. Young to assume that there was no heat and hot water in the home. (*Id.* at 45–46.) When asked about any other conditions of the home that he learned about in February 2007, prior to his entry on the 21st, Mr. Young testified to the following: "[T]he front door was left open to bang in the wind. The garbage wasn't put out when it was put out. There was odor, the rats. There were rats." (*Id.* at 46–47.)

Mr. Young testified that, on both February 15, 2007 and February 16, 2007, he sent letters, return receipt requested, to a Ms. Glass, a Ms. Jorgensen, and Judge Cohen, expressing his concern for the well-being of his children. (*Id.* at 53–54, 59.) Mr. Young states that he received no response from the letters, and that he did not again reach out to the police department or CPS on those dates. (*Id.* at 58–62.) Mr. Young claims that he also complained, in person, about the living conditions of the house to authorities at their

school, Our Lady of Perpetual Help in Lindenhurst, at various points throughout the 2005 to 2007 time period. (*Id.* at 69–70.)

Plaintiff acknowledges that the house had no water at one point in time in 2006, but she claims that the electricity and heat were never shut off. (D. Young Dep. at 27–28.) As to the lack of water in the house, plaintiff testified that it lasted for less than one day, and that it was a result of Mr. Young failing to pay the bills he was required to pay, pursuant to a court order. (*Id.* at 28–29.)[4] When asked about utilities in the home during February 2007, plaintiff testified that the house had heat, electricity, phone services, and water at that time. (*Id.* at 47–48.) Plaintiff claims that, prior to the February 21, 2007 incident, she never learned that her husband had concerns about the home and she also never received complaints from others. (*Id.* at 48–49.) Plaintiff also claims that the only thing that could be considered "abnormal" about the house in early 2007 is the boxes that were around the house for packing purposes, because she thought she might have to move. (*Id.* at 49–50.)

### 3. February 2007 Incident

Plaintiff and the Young children left the house on approximately February 19, 2007, to travel to Windham, New York. (Pl.'s 56.1 ¶ 8.) Plaintiff asserts that, on that date, the "Suffolk County, its police department, the Department of Social Services, and other departments and agencies in response to communication from the Defendants, Raymond L. Young, Raymond M. Young, and Joseph Quatela, planned and executed a warrantless invasion and search of Deborah Young's residence." (Pl.'s. 56.1 ¶ 15.)

---

**4.** The Court notes that, despite this testimony about the water being shut off one time for less than a day, later in her deposition plaintiff testified that "[t]he water was turned off, I

believe, at least twice, and a lot of times they were threatening to turn it off because it wasn't being paid." (D. Young Dep. at 89.)

### a. Entry into the Nevada Street House by Defendants

Mr. Young testified that, on February 21, 2007 at approximately 10:15 a.m., his father placed a call to the CPS hotline regarding the living conditions of the Nevada Street house. (Mr. Young Dep. at 70–71.) According to Mr. Young, his brother, Michael Young, also made a complaint to CPS on that same date, out of concern for the well-being of the Young children. (*Id.* at 73.) Later that day, at approximately 12:30 or 1:30 p.m., Mr. Young entered the house without plaintiff's knowledge or consent. (*Id.* ¶ 7; County defs.' 56.1 ¶¶ 8–9; Delgado 56.1 ¶ 6.) Mr. Young testified that this was the first time, since he began having concerns about the house beginning in February 2005, that he actually went to the property. (Mr. Young Dep. at 47.) According to Mr. Young, his father came to the house approximately a half hour after he first arrived. (*Id.* at 102.) The Young defendants subsequently called the Suffolk County Police Department for assistance regarding the "deplorable conditions at the house." (Delgado 56.1 ¶ 7; *see also* County defs.' 56.1 ¶ 9.)

Suffolk County police officers responded to the call for assistance—they entered the house and took photographs of the conditions inside the home. (County defs.' 56.1 ¶ 10.) The police's entry occurred approximately one hour after the Young defendants first entered the property. (Quatela 56.1 ¶ 9; *see also* Mr. Young Dep. at 130 (testifying that he had been at the house for between an hour and 20 minutes and an hour and a half before the police arrived).) According to Mr. Young's deposition testimony, the police did not have a court order to enter the home. (Mr. Young Dep. at 83.)

Quatela, Mr. Young's father's attorney at the time, was called about the situation at approximately 3 p.m. that day. (Quatela 56.1 ¶ 11.) Quatela states that he had no knowledge of any "plan" to enter the property before that point in time. (*Id.* ¶ 12.) Quatela arrived at the house after the police had already appeared on the scene, but before they had cleared. (*Id.* ¶ 13–14.) Quatela states that he was not involved in summoning the police, contacting CPS, or instructing the police or CPS, and that he did not reach any agreements (explicit or implicit) with the police, CPS, or any other government official relating to a planned "invasion" of the house. (*Id.* ¶¶ 14–16.)

The police also contacted CPS about the situation. (*Id.* ¶ 8; *see also* County defs.' 56.1 ¶ 11.) In response, Delgado, a senior caseworker in the Emergency Services Unit of the Suffolk County Department of Social Services' CPS, arrived at the house at approximately 5 or 6 p.m. to conduct an investigation on behalf of CPS. (County defs.' 56.1 ¶¶ 11–12; Quatela 56.1 ¶ 10.) Delgado saw no police officers or police vehicles at the house when he arrived. (County defs.' 56.1 ¶ 13.) Upon arrival, Delgado asked to speak to the owner of the home. Mr. Young identified himself as the homeowner, and Delgado explained that he was from CPS responding to concerns regarding the hygiene conditions of the home in which children were living. (*Id.* ¶¶ 14–15.) Mr. Young invited Delgado into the home, and Delgado subsequently toured the house. (*Id.* ¶ 16–17.)

### b. Conditions of the Nevada Street House

At his deposition, Mr. Young testified about the conditions of the house when he entered on February 21, 2007. He stated that when he walked in, "the stench dropped [him] to [his] knee. It was, like, the smell of death and urine and feces." (Mr. Young Dep. at 131.) He explained that certain areas of the house were

blocked off—areas that, to him, appeared uninhabitable. (*Id.* at 133.) In response to being asked what he saw in those "uninhabitable" areas, Mr. Young listed the following:

> [u]rine, feces, urine in water bottles, hundreds of water bottles filled with urine, soda bottles filled with urine, garbage, toilet tissue packed up to the ceiling, a dead cat, unusable kitchen, fecal matter all over the place, a smell—a stench of death in the house and it was dark and there were only cats running around and other animals that lived.

(*Id.* at 134.) He also testified that the heat was not on in the house. (*Id.*) When asked what rendered the kitchen unusable, Mr. Young replied,

> [t]he refrigerator door was wide open. The stove was open. There was a dead cat by the back door in a pile with cat litter with fecal matter piled on top of it. . . . There were sheets and, like, blankets over every area that light could get in the house. There was tape around the doorways.

(*Id.* at 135.) Mr. Young submitted an affidavit in this case, stating that he played no part in causing or staging the conditions of the house that he discovered on February 21, 2007. (Young defs.' Mot. for Summ. J. Ex. 10, Decl. of Raymond L. Young.) Mr. Young's father also submitted an affidavit, stating the same. (Young defs.' Mot. for Summ. J. Ex. 11, Decl. of Raymond M. Young.) Mr. Young's father testified that when he entered the house and walked into the living room and then the kitchen, he "couldn't go any further because of the stench, and [ ] just walked right back out the front door." (R.M. Young Dep. at 22.)

The police produced 13 photos that were taken on February 21, 2007. The photos are of various rooms of the house, and they show full garbage bags, many plastic and Styrofoam cups, heaps of trash, and many plastic bottles filled with a yellow-colored liquid. (*See* County defs.' Mot. for Summ. J. Ex. G, Police Investigation Photographs.)

Quatela states that he observed the house in a "deplorable state" when he first entered on February 21, 2007. (Quatela Aff. ¶ 5.) He claims that he played no role in causing or augmenting the deplorable condition—namely, the fact that the house was "filled with debris that appeared to include human waste." (*Id.*)

At his deposition, Delgado testified that as soon as he entered the house, he noticed a noxious odor. (Delgado Dep. at 85.) He also testified that, upon entering, he "observed what appeared to be bottles of urine on the floor, [and] black garbage bags with toilet paper with what appeared to be feces on them." (*Id.* at 34; *see also* County defs.' 56.1 ¶¶ 20, 22.) He noted that the upstairs bathroom was completely filled with toilet paper and feces. (County defs.' Mot. for Summ. J. Ex. C, CPS Investigation Report dated Feb. 26, 2007.) To the best of his knowledge, Delgado recalls Mr. Young telling him that Mr. Young had found the house in this condition when he first arrived. (Delgado Dep. at 34–35; County defs.' 56.1 ¶ 23.) Delgado was in the house for about 10 minutes. (County defs.' 56.1 ¶ 26.) The conditions in the house were such that Delgado considered it a risk to anyone living there, a risk to the children living there, and that it merited a further investigation by CPS. (*Id.* ¶¶ 27–29.) Mr. Young's father testified that Delgado told him that, in his approximately 21 years on the job, he had "never seen a scene" like this one. (R.M. Young Dep. at 26.)

According to plaintiff, "the house was not in a deplorable condition when she left for Windham, New York." (Pls.' 56.1 ¶ 10.) Plaintiff claims that when she returned

home on February 23, 2007, she noticed that someone had "taken the cat box and thrown it all over the place, and put it into the drawers with their clothing." (*Id.* ¶ 6.) She also claims that personal property belonging to her and her children was "stolen and destroyed." (D. Young Aff. ¶ 41.) When asked at her deposition about the urine, feces, and dead animals that Mr. Young and others claim they saw in the house, plaintiff testified that "[i]t was never established that there were dead animals in the house", (*id.* at 66), and that she does not know who brought the urine and feces in, (D. Young Dep. at 68). Despite the fact that at her deposition plaintiff disclaimed knowledge of who caused the conditions of the house, plaintiff contends that, while she was away in Windham, New York, Mr. Young and/or his friends and family "trashed and ransacked the [house] beyond recognition, causing extreme and irreparable damage to the belongings and personal property belonging to [her] and [her] children." (D. Young Aff. ¶ 37.)

However, the oldest of the Young children, Melissa Young, testified to the contrary. On April 5, 2012, Melissa Young submitted an affidavit in this case, testifying to the conditions of the home prior to and on the date of the incident. As a preliminary matter, Melissa Young states that her father and her grandfather "played no role in causing the conditions which were discovered on February 23, 2007," (Melissa Young Affidavit ("M. Young Aff.") ¶ 4), and that her mother "completely stopped taking care of the house . . . and the condition of the house progressively deteriorated until February 23, 2007", (*id.* ¶ 7.) In regards to the urine and feces, Melissa Young states that after the toilets in the house stopped working—approximately two years prior to the February 2007 incident—rather than get the toilets fixed, her mother "had [her] and

[her] sister urinate in plastic cups and [her mother] would pour them into plastic bottles" and that "[w]hen [her] and [her] sisters had bowel movements, [her] mother had [her] and [her] sister go into garbage bags." (*Id.* ¶ 8.) She testified that her "mother also urinated in cups and poured the urine into bottles and had bowel movements into garbage bags." (*Id.*) She also testified that her mother sometimes threw the garbage bags with feces and the bottles with urine out with the garbage, but that she left them around the house on other occasions. (*Id.* ¶ 9.)

c. Resolution of the Incident

As a result of Delgado's inspection of the home, CPS sought a hearing in the Family Court of the State of New York, County of Suffolk, pursuant to N.Y. Family Court Act § 1022, seeking the temporary removal of the Young children from the home. (County defs.' 56.1 ¶ 30.) As a result of the February 23, 2007 hearing, it was ordered that the Young children be removed from the home and placed in the custody of the Suffolk County Department of Social Services. (County defs.' Mot. for Summ. J. Ex. I, Order Directing Temporary Removal of Child; *see also* Pls.' 56.1 ¶ 20.) The children were subsequently placed into foster care. (Pls.' 56.1 ¶ 20.)

A petition charging plaintiff with neglect of her children was subsequently filed in Family Court. (County defs.' 56.1 ¶ 32.) On March 4, 2007, plaintiff admitted to the charge of neglect. (*Id.* ¶ 33; *see also* Quatela 56.1 ¶ 18.) Plaintiff also admitted that, from 2006 through February 2007, she suffered from a mental condition that negatively impacted her ability to care for her children, and that she failed to timely obtain the necessary treatment for her mental health condition. (D. Young Aff. ¶ 46.) Plaintiff has not since regained custody of her children.

## B. Prior State Court Proceedings

The instant lawsuit is but one in a long series of legal proceedings between these parties. In December 2005, Raymond M. Young and his wife, the paternal grandparents of the Young children, commenced a lawsuit against Ms. Young in Suffolk County Supreme Court, alleging intentional infliction of emotional distress, harassment and intimidation, prima facie tort, and injurious falsehood. That lawsuit was dismissed by Judge Jeffrey Arlen Spinner on July 18, 2006, for failure to both state a cause of action and raise a triable issue of fact. *See Young, et al. v. Young,* No.2005–27931 (N.Y.Sup.Ct.2006).

On October 31, 2006, Deborah Young and Raymond L. Young entered into a stipulation of settlement, pursuant to which they resolved their matrimonial issues, and Ms. Young was given sole custody of the children. On March 5, 2007, Suffolk County Department of Social Services filed a petition of neglect to have the children removed from Ms. Young's custody. On May 4, 2007, in Suffolk County Family Court, Deborah Young pled guilty to neglect of her three children. Specifically, Ms. Young acknowledged that she suffered from a mental health condition that negatively impacted her ability to care for her children. (Tr. of Proceedings, at 4–7, *Suffolk County CPS v. Young,* Nos. NN–3875–07, NN–3876–08, NN–3877–07 (N.Y.Fam.Ct., Suffolk County May 4, 2007).) The children were subsequently placed in foster care.

By Order to Show Cause dated November 25, 2007, Raymond L. Young sought to vacate the marital stipulation of settlement on the ground that he was fraudulently induced into signing the agreement. Raymond L. Young contended that he was the victim of parental alienation, and claimed that he was wrongfully accused of acts of violence and sexual abuse against the children. On October 19, 2007, a Permanency Hearing Order was issued by the Suffolk County Family Court. On July 2, 2008, an order was issued which permitted, with certain limitations, unsupervised visitation between the children and both parents. Visitation with both parents was increased by order dated September 4, 2008, and visitation with both paternal and maternal grandparents, with certain limitations, was ordered on November 10, 2008. *See Young v. Young,* Nos. N–3875–07, N–3876–07 and N–3877–07 (N.Y. Fam. Ct., Suffok County, Jan. 27, 2010). On June 4, 2009, visitation to both parents was expanded to unsupervised overnight weekend visitation. Additional summer visitation to both parents was ordered on July 9, 2009. *Id.* In an opinion dated January 27, 2010, Raymond L. Young was awarded sole custody of the children. *Id.*

On April 30, 2008, Raymond L. Young filed suit in Suffolk County Supreme Court against Deborah Young, her parents, Suffolk County Department of Social Services, and a host of other defendants, alleging that Ms. Young and her parents made numerous unfounded reports to authorities that the children were sexually, physically, and otherwise abused by Raymond L. Young and his parents, and that Ms. Young and her parents also manipulated and compelled the children to complain to authorities about the fabricated abuses. Ms. Young and her parents asserted several counterclaims against Raymond L. Young. The court dismissed Raymond L. Young's claims for intentional infliction of emotional distress, malicious prosecution, and prima facie tort. *See Young, et al. v. Vasquez, et al.,* No. 08–14394, slip op. at 2–4 (N.Y.Sup.Ct.2009). The court also dismissed Ms. Young's counterclaims for intentional infliction of emotional distress, defamation, abuse of process and malicious prosecution, invasion of privacy, trespass

to chattels, and alienation of affection. *Id.* at 5–6.

## C. Procedural History

Plaintiff filed the complaint in this action on July 30, 2009 against the County defendants, the Young defendants, Quatela, and the media defendants. On that same date, plaintiff also filed an Order to Show Cause to remove her children from foster care and return them to her custody. Judge Joanna Seybert denied the application that day. On October 2, 2009, plaintiff filed an amended complaint.

On October 7, 2009, the County defendants filed an answer to the amended complaint. On November 2, 2009, the Young defendants filed a motion to dismiss the action for failure to state a claim, as well as a motion for sanctions. Quatela filed a verified answer to plaintiff's amended complaint on that same date. On December 4, 2009, all media defendants filed a motion to dismiss and Quatela filed a motion for judgment on the pleadings. Plaintiff filed an opposition to the Young defendants' motion to dismiss on December 16, 2009, and an opposition to the media defendants' motion to dismiss on January 11, 2010. The Young defendants filed a reply on January 14, 2010, and the media defendants filed a reply on January 26, 2010. Plaintiff filed an opposition to Quatela's motion for judgment on the pleadings on February 4, 2010, and Quatela submitted a reply on February 22, 2010. Oral argument was heard on March 4, 2010. On April 9, 2010, the Court issued a Memorandum and Opinion (1) granting the media defendants' motion to dismiss in its

entirety, (2) denying the Young defendants' motion and Quatela's motion with respect to plaintiff's Section 1983 claims for violation of the Fourth Amendment and conspiracy, (3) granting the Young defendants' motion and Quatela's motion with respect to all other federal and state claims alleged by plaintiff in her complaint, and (4) denying the Young defendants' motion for sanctions. *Young v. Suffolk Cnty.,* 705 F.Supp.2d 183 (E.D.N.Y.2010).

On April 20, 2010, Quatela filed a motion for reconsideration of the Court's April 9, 2010 Memorandum and Opinion. The Court denied Quatela's motion on May 20, 2010. On April 23, 2010, the Young defendants filed a verified answer to plaintiff's amended complaint, as well as a counterclaim against plaintiff for negligence and failure to maintain property. Plaintiff filed a verified reply to the Young defendants' verified answer and counterclaim on May 22, 2010.

In April 27, 2012, the County defendants, the Young defendants, and Quatela each filed motions for summary judgment on plaintiff's remaining claims. The Young defendants also filed a motion for sanctions on that date. On June 14, 2012, plaintiff filed separate opposition papers to each of the motions for summary judgment, as well as an opposition to the Young defendants' motion for sanctions. On June 29, 2012, the Young defendants filed replies in further support of both their motion for summary judgment and their motion for sanctions. Quatela filed a reply on July 10, 2012, and the County defendants filed a reply on July 18, 2012.[5]

---

5. On July 20, 2012, plaintiff filed a letter motion requesting that the Court strike County defendants' reply as untimely. The County defendants in fact filed their reply papers after the deadline originally set by the Court, (*see* May 31, 2012 Order (directing defendants to file reply papers on or before July 10,

2012)), without first seeking an extension from the Court. However, the Court notes that the County defendants re-filed their memorandum of law in support of their motion for summary judgment on June 29, 2012 (even though it had already been filed, pursuant to the Court-ordered briefing schedule, on

Oral argument was held on July 24, 2012. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R.Civ.P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996)); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial." Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247–48, 106 S.Ct. 2505. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

## III. DISCUSSION

### A. Plaintiff's Section 1983 Claims

 Plaintiff asserts that defendants violated her constitutional rights under

---

April 27, 2012). Because it appears that the County defendants' tardiness in filing their reply papers was due to a delayed recognition of a filing mistake (that they had re-filed their original memorandum on June 29, 2012,

rather than their reply papers) and because plaintiff has suffered no prejudice from the delay, the Court declines to strike the County defendants' reply.

Section 1983. To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. Section 1983 does not itself create substantive rights; it offers "a method for vindicating federal rights elsewhere conferred." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir.2004).

Here, plaintiff brings claims under Section 1983 against the Young defendants, Quatela, and Delgado for unlawful entry in violation of the Fourth Amendment and for conspiracy.

### 1. Fourth Amendment Claims

Plaintiff alleges that the Young defendants, Quatela, and Delgado violated her Fourth Amendment rights by unlawfully entering the Nevada Street house and conducting a warrantless search of the property. As set forth below, each defendant is entitled to summary judgment on this claim because, even when viewed in the light most favorable to plaintiff, no rational jury could conclude that (1) the Young defendants and Quatela were acting under the color of state law when they entered the Nevada Street house on February 21, 2007, or (2) Delgado violated plaintiff's Fourth Amendment rights when he entered the home that same day.

#### a. Alleged Unlawful Entry By the Young Defendants and Quatela

Plaintiff claims that both the Young defendants and Quatela violated her Fourth Amendment rights by entering the Nevada Street house on February 21, 2007 without a warrant. Plaintiff claims that she was awarded exclusive use and occupancy of the house and that, as a result, when both the Young defendants and Quatela entered the premises without her permission and without a warrant, they did so in violation of her Fourth Amendment rights. For the reasons set forth below, the Court concludes that there is no evidence that the Young defendants or Quatela were acting under color of state law when they entered the house. As such, they cannot be held liable for any violation of Section 1983, and summary judgment on plaintiff's Section 1983 Fourth Amendment claims must be granted in their favor.

##### i. Applicable Law

A private actor may be considered to be acting under the color of state law for purposes of Section 1983 if the private actor was " 'a willful participant in joint activity with the State or its agents.' " *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir.2002) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). This potential liability under Section 1983 also applies to a private party who "conspires with a state official to violate the plaintiff's constitutional rights...." *Fisk v. Letterman*, 401 F.Supp.2d 362, 378 (S.D.N.Y. 2005). Thus, in order to prove that a private actor was acting under the color of state law when he engaged in allegedly unconstitutional conduct, a plaintiff must point to evidence tending to show either (1) the existence of joint activity between the private actor and the state or its agents, or (2) a conspiracy between the state or its agents and the private actor.

As to a showing of joint activity, the summoning of police officers or the provision of information to police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of Section 1983. *See Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir.1999) ("Healey's provision of background information to a police officer does not by itself

make Healey a joint participant in state action under § 1983 [and] Officer Fitzgerald's active role in attempting to resolve the dispute after Healey requested police assistance in preventing further disturbance also does not, without more, establish that Healey acted under color of law."); *see also Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir.1983) ("The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under [Section] 1983 . . . ."). Similarly, if a police officer's actions are due to the officer's own initiative, rather than the directive of a private party, the private party will not be deemed a state actor. *See Shapiro v. City of Glen Cove*, 236 Fed.Appx. 645, 647 (2d Cir.2007) (declining to hold that private actor acted under color of state law when "ample evidence show[ed] that the officials who searched [plaintiff's] house exercised independent judgment rather than acting at [private actor's] direction"); *Butler v. Goldblatt Bros.*, 589 F.2d 323, 327 (7th Cir.1978) (granting summary judgment to private defendant on plaintiff's Section 1983 claim because defendant "did [nothing] more than supply information to police officers who then acted on their own initiative in arresting [plaintiff]"); *Serbalik v. Gray*, 27 F.Supp.2d 127, 131–32 (N.D.N.Y.1998) ("[A] private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority." (citing *Auster Oil & Gas Inc. v. Stream*, 764 F.2d 381, 388 (5th Cir.1985))).

■■■■ Moreover, a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law. *Kash v. Honey*, 38 Fed.Appx. 73, 75–76 (2d Cir.2002) (finding no state action by private lawyer who plaintiff alleged "maliciously, for purpose

or purposes personal to him, including the purpose of penalizing [plaintiff] for exercising his First Amendment rights . . . falsely charged [plaintiff] in an accusatory instrument"); *Shapiro v. City of Glen Cove*, No. CV 03–0280(WDW), 2005 WL 1076292, at *7 (E.D.N.Y. May 5, 2005) ("In any event, whatever motivation [a private party] may have had in calling in the complaint and alerting the media is irrelevant to the question of whether she was a state actor."). Thus, it is only when a private actor takes a more active role and jointly engages in action with state actors, that he will be found to have acted under color of state law for purposes of Section 1983. *See, e.g., Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (finding that, when a supplier sought prejudgment attachment of a debtor's property, supplier was a state actor because he "invok[ed] the aid of state officials to take advantage of state-created attachment procedures"); *Adickes*, 398 U.S. at 152, 90 S.Ct. 1598 (finding plaintiff entitled to relief under Section 1983 against private party if she could prove that private party and police officer "reached an understanding" to cause her unlawful arrest).

■■■■ Alternatively, to demonstrate that a private party was acting under color of state law by virtue of the fact that he was engaged in a conspiracy with the state or its agents, a plaintiff must put forth evidence of "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act in furtherance of that goal causing damages." *Fisk*, 401 F.Supp.2d at 376 (quoting *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir.2002)). Unsubstantiated allegations of purported collaboration between a state actor and a private party are insufficient to defeat a motion for summary judgment.

*See Scotto v. Almenas,* 143 F.3d 105, 115 (2d Cir.1998); *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (affirming grant of summary judgment in defendants' favor because plaintiff's allegations of conspiracy were "unsupported by any specifics, and many of them [were] flatly contradicted by the evidence proffered by defendants").

### ii. Analysis

Plaintiff claims that, on February 21, 2007, both the Young defendants and Quatela "acted under color of state law, by clearly being a willful participant in the joint action with the State and its agents." (Pl.'s Opp'n to Young defs.' Mot. for Summ. J. ("Young Opp'n") at 15; Pl.'s Opp'n to Quatela's Mot. for Summ. J. ("Quatela Opp'n") at 7.) Essentially, plaintiff claims that both the Young defendants and Quatela collaborated with the County defendants to institute a warrantless search of the Nevada Street house. For the reasons set forth below, the Court finds that plaintiff has failed to proffer any evidence to show that either the Young defendants or Quatela (1) acted jointly with the County defendants, or (2) entered into a conspiracy with the County defendants. Accordingly, plaintiff has failed to raise a genuine issue of material fact as to whether the Young defendants or Quatela were acting under color of state law when they engaged in the unconstitutional conduct alleged and summary judgment must be granted in defendants' favor.

#### (1) The Young Defendants

As a preliminary matter, there is no evidence in the record of a concerted or premeditated plan between the Young defendants and the County defendants to violate plaintiff's Fourth Amendment rights. To the contrary, the uncontroverted evidence shows that the Young defendants repeatedly contacted the County defendants about inspecting the Nevada Street house prior to February 21, 2007, but that no action was taken. *See supra* Part I.A.2. Moreover, it is uncontroverted that the Young defendants did not contact the police for assistance on February 21, 2007 until *after* they had already entered the home. (Delgado 56.1 ¶ 7; *see also* County defs.' 56.1 ¶ 9.) Thus, the evidence shows that when the Young defendants entered the house on February 21, 2007, they did so without knowing whether the County defendants would in fact enter in a similar fashion and/or on that same day.

It is also uncontroverted that the Young defendants alerted the County defendants to the conditions of the Nevada Street house and encouraged them to inspect the premises. (Delgado 56.1 ¶ 7; County defs.' 56.1 ¶ 9.) However, merely summoning and/or providing information to state actors, without more, does not constitute joint action for the purposes of Section 1983. *See Ginsberg,* 189 F.3d at 272; *see also Benavidez,* 722 F.2d at 618. Plaintiff claims that the Young defendants "were not 'mere complainants,' but were implicated in the deprivation of the Plaintiff's rights to a more significant and blameworthy degree." (Young Opp'n at 19.) In support of this contention, plaintiff alleges that the Young defendants staged the conditions of the home, (D. Young Aff. ¶ 37; *see also* Young Opp'n at 24), and "purposely made false statements to the authorities" to implicate plaintiff for the deplorable conditions, (Young Opp'n at 20–21.) Thus, according to plaintiff, the Young defendants "were participating actively in an activity that would have resulted in both the unlawful search and presumptively valid judicial proceeding." (*Id.* at 21.) However, regardless of whether these allegations have any merit, they do not indicate any joint activity or plan between the Young defendants and the County defendants. Instead, the uncon-

troverted evidence shows that the County defendants entered and searched the house without a warrant on their own initiative. (*See* County defs.' 56.1 ¶ 10 ("Police officers entered the house and the Police Department's Crime Scene Unit took photographs of the conditions inside the home."); *id.* ¶¶ 12–19 (explaining that Delgado arrived at the house hours after the Young defendants, "informed Young that he was there due to CPS concerns regarding the hygiene conditions of the house", and proceeded to enter and search the premises).) Accordingly, given this uncontroverted evidence and the absence of any evidence to support plaintiff's claim, the Young defendants cannot be deemed state actors. *See Shapiro,* 236 Fed.Appx. at 647 (explaining that when a state actor's alleged unconstitutional conduct is due to his own initiative, rather than the directive of a private party, the private party will not be deemed a state actor).

Essentially, plaintiff claims that the Young defendants framed her—that they created the conditions in the home, alerted the County defendants to the conditions, blamed plaintiff for the conditions, all in an attempt to make plaintiff look like an unsuitable parent. (*See* Young Opp'n at 21 ("It is reasonable to conclude, however, that when the young Defendants telephoned the authorities, they anticipated that the Plaintiff would be blamed for the condition of the home.").) The Court notes, however, that at her deposition, plaintiff explicitly denied having any knowledge of who created the conditions in the Nevada Street house on February 21, 2007. (*See* D. Young. Dep. at 68.) In any event, the Young defendants' motivation for calling in their complaints to the County defendants is irrelevant to the question of whether they were state actors on February 21, 2007. *See Kash,* 38 Fed. Appx. at 75–76; *Shapiro,* 2005 WL 1076292, at *7. For all of these reasons,

plaintiff has failed to put forth any evidence that the Young defendants were engaged in joint activity with the County defendants.

Plaintiff has similarly failed to proffer any evidence that raises a genuine issue of material fact as to the existence of a conspiracy between the Young defendants and the County defendants. As discussed above, plaintiff has not put forth any evidence of the first two elements of a conspiracy claim—a plan or "agreement" between the Young defendants and the County defendants to "act in concert to inflict an unconstitutional injury." *Fisk,* 401 F.Supp.2d at 376. Instead, plaintiff merely speculates, without any evidentiary support, that "it is reasonable to conclude" that the Young defendants had a "preconceived plan" with the County defendants, and that the Young defendants were "colluding" with the County defendants to violate plaintiff's Fourth Amendment rights. (*See* Young Opp'n at 21 ("Although no preconceived plan or scheme was necessary, it is reasonable to conclude that [the Young defendants] had one."); *id.* ("[The Young defendants] were colluding with the police and other authorities in executing a warrantless search of the Plaintiffs' [sic] home, making the Young Defendants state actors . . . .").) However, such unsubstantiated allegations of purported collaboration between the Young defendants and the County defendants are insufficient to defeat the Young defendants' motion of summary judgment. *See Scotto,* 143 F.3d at 115. Thus, plaintiff has failed to proffer any evidence from which a rational jury could find state action by the Young defendants.

In sum, plaintiff has failed to point to any evidence from which a rational jury could find (1) the existence of joint activity, or (2) a conspiracy between the Young defendants and the County defendants.

Accordingly, because there is no evidence that the Young defendants were acting under color of state law when they allegedly violated plaintiff's Fourth Amendment rights, summary judgment on plaintiff's Section 1983 Fourth Amendment claim is granted in their favor.

### (2) Quatela

■ As for Quatela, although, as stated *supra,* summoning of the police alone is not enough to constitute state action, there is no evidence in the record that Quatela was even involved in calling the police to the Nevada Street house on the date of the incident in question. Indeed, when asked at her deposition whether she has any reason to believe Quatela called the police to the house, plaintiff responded, "I'm not sure." (D. Young Dep. at 74.) In fact, the uncontroverted evidence shows that Quatela arrived to the house for the first time *after* the police had already entered and begun to search the premises. (Quatela 56.1 ¶ 13–14.)[6] Thus, the uncontroverted evidence demonstrates that the police most certainly did not enter the home under Quatela's directive. Accordingly, there was no joint action between Quatela and the police to deem Quatela a state actor for purposes of Section 1983. *See Shapiro,* 236 Fed.Appx. at 647.

There is also no evidence in the record of any joint activity between Quatela and CPS or, more specifically, Delgado. It is undisputed that it was the police, and not Quatela, who contacted CPS about the conditions of the Nevada Street house on February 21, 2007. (Quatela 56.1 ¶ 8; *see also* County defs.' 561. ¶ 11.) Moreover, the record is clear that Delgado arrived at the house to conduct an inspection on behalf of CPS in response to that call from the police, (County defs.' 56.1 ¶¶ 11–12; Quatela 56.1 ¶ 10), and that his subsequent entry into the home without a warrant that same day was not directed by Quatela, (*see* County defs.' 56.1 ¶ 15–19.) Plaintiff has therefore failed to set forth any evidence of joint activity between Quatela and any of the County defendants.

Plaintiff has also failed to show that any conspiracy existed between Quatela and the County defendants. Plaintiff has not pointed to any evidence tending to show that there was *any* "agreement" between Quatela and the County defendants, let alone one to "act in concert to inflict an unconstitutional injury." *See Fisk,* 401 F.Supp.2d at 376. Moreover, Quatela asserts, and plaintiff does not dispute, that he did not reach any agreements (implicit or explicit) with the police, CPS, or any other government official relating to a planned "invasion" of the house. (Quatela 56.1 ¶¶ 14–16.) Thus, even construing the evidence most favorably to plaintiff, Quatela cannot be deemed a state actor on the basis of any conspiracy theory.

Because plaintiff has failed to proffer any evidence of either (1) joint activity, or (2) a conspiracy between Quatela and the

---

**6.** The Court notes that, at her deposition, plaintiff testified that she believes Quatela was at the house before the police arrived. (D. Young Dep. at 75.) However, when asked about her basis for this belief, plaintiff responded with pure speculation, stating that her "husband's father was there, and if he was there [she's] sure his attorney was there with him." (*Id.*) Moreover, when asked specifically whether anyone was at the house at the time of Quatela's entry, plaintiff responded, "I was not there, my children were not there." (*Id.* at 63.) Plaintiff also testified that no one ever told her that they saw Quatela at the house on February 21, 2008 before the police arrived. (*Id.* at 77–78.) Thus, because plaintiff's deposition testimony does not adequately call into question Quatela's stated timing of his entry, and because plaintiff failed to contest Quatela's stated timing of his entry in her Rule 56.1 statement, the Court is convinced that Quatela arrived at the premises after the police had already entered the house.

**390**

County defendants, no rational jury could conclude that Quatela was acting under color of state law when he allegedly violated plaintiff's Fourth Amendment rights. Accordingly, as with the Young defendants, summary judgment on plaintiff's Section 1983 Fourth Amendment claim is granted in Quatela's favor.

b. Alleged Unlawful Entry By Delgado

As to Delgado, plaintiff claims that he entered and searched the Nevada house, upon invitation by the Young defendants and without a warrant, in violation of her Fourth Amendment rights. The County defendants move for summary judgment, arguing that Delgado had consent to enter the premises and, as such, his warrantless entry was justified. For the reasons set forth below, the uncontroverted evidence in the record demonstrates that Mr. Young had apparent authority to consent to Delgado's entry and, as such, Delgado did not violate plaintiff's Fourth Amendment rights when he entered the house without a warrant.[7] Accordingly, the Court grants summary judgment in favor of the County defendants on plaintiff's Section 1983 Fourth Amendment claim against Delgado.

i. Applicable Law

 The Fourth Amendment protects individuals in their homes "against unreasonable searches and seizures." U.S. Const. amend. IV. "A warrantless search is 'per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir.1995) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). One such exception to the warrant requirement is voluntary consent, either "by the party whose property or person is to be searched," *Holeman v. City of*

*New London*, 425 F.3d 184, 191 (2d Cir. 2005), or "by an authorized third party," *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir.2004). Depending on the circumstances, "[t]hat person might be the householder against whom evidence is sought, or a fellow occupant who shares common authority over property, when the suspect is absent." *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (citing *Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041 and *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)).

 The Fourth Amendment not only covers searches for evidence of crime, but also encompasses administrative searches. Under the Fourth Amendment, "one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Mun. Court of S.F.*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Thus, under the Fourth Amendment, administrative searches generally cannot be made without valid consent, unless a search warrant is first obtained.

 As to the sufficiency of third-party consent, "the law in this circuit is well settled that a third party's consent will validate a search of places or items in which another maintains a privacy interest if two conditions are satisfied: the third party had (1) 'access to the area searched,' and (2) either '(a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access [to the area].'" *United States v. Snype*, 441 F.3d 119, 136 (2d Cir.2006) (quoting

**7.** Given that the uncontroverted evidence demonstrates that apparent authority existed for the entry by Delgado, the Court need not address whether there was actual authority.

*Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 53 (2d Cir.2003)). The consent of one who possesses common authority over the premises is valid as against absent, non-consenting persons with whom the authority is shared. *Matlock*, 415 U.S. at 170, 94 S.Ct. 988. "Thus, in any third party consent case, the issue to be resolved is whether the consenting party possessed a sufficient relationship to the searched premises to validate the search. Mutual use of property, or joint access or control of property, is generally sufficient." *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir.1988) (citations omitted).

■■■■■ However, even if a third party "lacks *actual* authority to consent to a search of a particular area, he still may have apparent authority to consent to the search." *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir.2007). Apparent authority to give consent "must be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also United States v. Cicuto*, No. 10 Cr. 138(PAC), 2010 WL 3119471, at *5 (S.D.N.Y. Aug. 6, 2010) (finding apparent authority when "it was objectively reasonable for the DEA agents to believe that [defendant] had the authority to consent to a search of" the premises in question).

Thus, even if the person giving consent in fact lacked authority to do so, the consent is still valid—and thereby sufficient to lawfully permit a warrantless search of the premises—if the person had apparent authority to consent.

#### ii. Analysis

It is undisputed that Mr. Young consented to the County defendants' entry on February 21, 2007. He allowed both members of the Suffolk County Police Department and Delgado, on behalf of the Suffolk County Department of Social Services, into the Nevada Street house on that date. (County defs.' 56.1 ¶¶ 9–10, 16–17.) The question before this Court is therefore whether Mr. Young had actual or apparent authority to consent to a search of the Nevada Street house, such that Delgado could in fact lawfully enter the premises without a search warrant.[8]

##### (1) Actual Authority

■■■■ Plaintiff contends that Mr. Young did not have actual authority to consent to a search of the Nevada house, despite the fact that the Young defendants owned title to the home. In support of this assertion, plaintiff explains that "Raymond L. Young did not possess common authority over the marital residence", (Pl.'s Opp'n to County defs.' Mot. for Summ. J. ("County Opp'n") at 20), and that Mr. Young "had not been a regular habitant of the residence since in or about May 2001", (*id.*). Plaintiff also cites *Matlock*, 415 U.S. 164, 94 S.Ct. 988, and contends that the Supreme Court "acknowledged that the relevant basis for

---

**8.** The Court notes that, in their opposition papers, County defendants contend that "there is no *per se* requirement that a warrant be obtained to conduct an administrative search, the goal of which is other than enforcement of the criminal law." (County Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("County Mem.") at 8.) As discussed *supra*, the Fourth Amendment not only covers searches for evidence of crime, but also encompasses administrative searches. Moreover, social workers, in particular, have explicitly been found to be subject to the Fourth Amendment's warrant requirement. *See Andrews v. Hickman Cnty.*, 700 F.3d 845, 859 (6th Cir.2012) ("[A] social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement.").

'common authority' does not adhere to the law of property ownership, but rather upon shared use of the property." (County Opp'n at 21.) Accordingly, plaintiff claims that, because Mr. Young was a title owner of the property, but did not reside there or share in its use, he did not have the kind of "common authority" that is required to consent to a search of the premises. (*Id.*)

■■■■ The determination of whether a party possesses common authority over an area, a substantial interest in the area, or permission to gain access to the area is fact-dependent. As plaintiff contends, ownership of property is not a determinative factor in the inquiry. In *Matlock*, the Supreme Court explained,

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justified the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n. 7, 94 S.Ct. 988. Thus, Mr. Young's ownership of the property is not alone enough to imbue him with actual authority over the premises. However,

because, for the reasons discussed *infra*, the Court concludes that the uncontroverted evidence demonstrates that Mr. Young had apparent authority to consent to a search, the Court need not determine whether Mr. Young in fact possessed actual authority over the premises.

### (2) Apparent Authority

■■■■ In regards to apparent authority, plaintiff contends, in her opposition to the County defendants' motion for summary judgment, that she "possessed an expectation of privacy that was not diminished by the Young Defendants' allegations of apparent authority", (County Opp'n at 21), without addressing any of the County defendants' arguments regarding Mr. Young's apparent authority over the premises.

It is uncontroverted that the Young defendants entered the Nevada Street house before the police or Delgado arrived at the scene. (County defs.' 56.1 ¶¶ 8–9.) The police arrived at the home in response to a call from the Young defendants about the deplorable conditions contained within, and the Young defendants invited them to enter and investigate the space. (*Id.* at ¶¶ 9–10.) Thus, not only did the Young defendants consent to the police's entry, but they called the police to the scene in the first place. The police were therefore responding to a call from a father and grandfather concerned about the health and well-being of their children and grandchildren, respectively, who were living in a house owned and accessed by the father and grandfather. Based on these uncontroverted facts, an officer arriving at the house would believe that the Young defendants had the authority to consent to a search of the premises, and no rational jury could therefore conclude that the Suffolk County police officers who arrived at

the scene unlawfully entered the Nevada Street house.

Similarly, based on the undisputed facts, a rational jury could only conclude that Delgado entered the house without a warrant because he believed Mr. Young had the authority to grant him permission to do so. Delgado arrived at the scene to investigate suspected child abuse. Upon arrival, Mr. Young invited Delgado into the house to view the living conditions where the Young children resided, in a home that he owned title to. (*Id.* ¶ 16.) The County defendants contend, and the Court agrees, that, given the undisputed facts, "once [Mr.] Young identified himself as both the father of the children and the homeowner, and then permitted Delgado to enter the house, it was reasonable for Delgado to believe that [Mr.] Young had the authority to consent to his entry for purposes of a CPS investigation." (County Mem. at 11.) Thus, based upon the uncontroverted evidence, it is clear that Mr. Young had apparent authority to consent to Delgado's search of the premises. Even construing the evidence most favorably to plaintiff, no rational jury could conclude otherwise. Accordingly, Delgado's entry without a warrant did not violate plaintiff's Fourth Amendment rights, and plaintiff's Section 1983 Fourth Amendment claim against Delgado does not survive summary judgment.[9]

### 2. Conspiracy Claim

Plaintiff also brings a Section 1983 conspiracy claim against all defendants. Plaintiff claims that there was a " 'meeting of the minds' between the County authorities and the Youngs and Mr. Quatela", and that she has "alleged sufficient facts to support the allegation of conspiracy." (County Opp'n at 27.) Because the Court finds that the evidence in the record does not support plaintiff's "conclusory allegations" and "unsubstantiated speculation" in regards to her conspiracy claim, the Court concludes that plaintiff has failed to prove the existence of a conspiracy between the County defendants and either the Young defendants or Quatela to defeat summary judgment. *See Scotto*, 143 F.3d at 114 ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation.").

As discussed *supra*, given that plaintiff has failed to provide any evidence of the existence of an "agreement" between the County defendants and either the Young defendants or Quatela to "act in concert to inflict an unconstitutional injury" on plaintiff sufficient to deem the Young defendants or Quatela state actors, plaintiff's Section 1983 conspiracy claim also fails

---

9. Even if there were some disputed issue of fact that precluded summary judgment on the apparent authority issue, Delgado would be entitled to qualified immunity because the other uncontroverted facts described above—namely, that Mr. Young owned the house and already had access—are sufficient for the police and Delgado to have reasonably believed that Mr. Young had apparent authority to consent to a search of the premises, even if that belief was erroneous. *See, e.g., Morales v. Boyd*, 304 Fed.Appx. 315 (5th Cir.2008) ("[T]he Officers reasonably believed that they were executing the search pursuant to valid consent and are protected by qualified immunity."); *Sterling–Ward v. Tujaka*, 230 Fed. Appx. 570 (6th Cir.2007) (affirming qualified immunity determination based upon apparent authority); *Krug v. County of Rennselaer*, No. 1:04–CV–0640 (TJM/DRH), 2010 WL 3937319, at *5 (N.D.N.Y. Oct. 5, 2010) ("[Police officer] is entitled to qualified immunity for the search of the van because it was objectively reasonable for him [to] conclude that the search was constitutionally permitted because it had been consented to by a person having apparent authority over the vehicle."); *Kaspar v. City of Hobbs*, 90 F.Supp.2d 1313, 1320 (D.N.M.2000) (police had qualified immunity on claim that caretaker had apparent authority to authorize search of common areas of the house).

with respect to both the Young defendants and Quatela. *See supra* Parts III.A.1.a.ii.(1) and III.A.1.a.ii.(2) (quoting *Fisk*, 401 F.Supp.2d at 376).[10] Additionally, because, as discussed *supra*, plaintiff's underlying Section 1983 cause of action—warrantless entry in violation of the Fourth Amendment—cannot be established as to Delgado, her claim for conspiracy against him must also fail. *See Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (granting summary judgment in defendants' favor on plaintiff's conspiracy claim because neither of plaintiff's underlying Section 1983 causes of action could be established). Accordingly, the Court grants summary judgment in favor of all defendants on plaintiff's Section 1983 conspiracy claim.

### B. Plaintiff's *Monell* Claim

▉▉▉ Plaintiff also asserts a *Monell* claim against Suffolk County. (*See* Am. Compl. ¶ 39.)[11] As set forth below, that claim cannot survive summary judgment.

▉▉▉ The Supreme Court has explained that a municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir.1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by city officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (citing *Monell*, 436 U.S. at 691, 98 S.Ct. 2018) (internal quotation marks omitted). Moreover, a policy, custom, or practice of the entity may be inferred where " 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional

---

10. In her opposition papers, plaintiff contends that "State action is not necessary for a claim of conspiracy under § 1985(3)." (Young Opp'n at 21.) However, the Court dismissed plaintiff's Section 1985 conspiracy claim on April 9, 2010. *See Young v. Suffolk Cnty.*, 705 F.Supp.2d 183, 208 (E.D.N.Y. 2010). Thus, only plaintiff's Section 1983 conspiracy claim remains at the summary judgment phase, and plaintiff must prove the existence of a conspiracy between a private party and a state actor in order for her claim to survive summary judgment. *See Maloney v. Cnty. of Nassau*, 500 Fed.Appx. 30, 32–33 (2d Cir.2012) (requiring evidence that private person charged with Section 1983 conspiracy acted in concert with state actor(s) to inflict an unconstitutional injury, in order for the conspiracy claim to survive summary judgment).

11. In her amended complaint, plaintiff asserts a *Monell* claim against both Suffolk County and the Suffolk County Police Department.

The Court notes, however, that the Suffolk County Police Department is "merely [an] administrative arm[] of a municipality"—Suffolk County—and "do[es] not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't*, 224 F.Supp.2d 463, 477 (E.D.N.Y.2002); *see also Melendez v. Nassau County*, No. 10–CV–2516 (SJF)(WDW), 2010 WL 3748743, at *5 (E.D.N.Y. Sept. 17, 2010) (dismissing plaintiff's claims against the Nassau County Sheriff's Department Division of Correction and the Nassau County Correctional Center because those entities are "administrative arms of Nassau County, and therefore are not suable entities"). Thus, plaintiff cannot raise a plausible *Monell* claim against the Suffolk County Police Department, and such claim is dismissed. In any event, the same analysis would apply for both the Suffolk County Police Department and Suffolk County. Therefore, the Court only analyzes plaintiff's *Monell* claim with respect to Suffolk County.

rights of those within its jurisdiction.'" *Patterson,* 375 F.3d at 226 (quoting *Kern,* 93 F.3d at 44). However, a municipal entity may only be held liable where the entity *itself* commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell,* 436 U.S. at 691, 98 S.Ct. 2018.

As a preliminary matter, plaintiff's asserted theory of *Monell* liability is premised on a claim of alleged constitutional misconduct that the Court already dismissed. Specifically, in her amended complaint, plaintiff alleges that "it was the official policy or custom of Suffolk County and the Police Department to alert, notify and invite the media and press to accompany the police on what is now known as a 'media ride along' in direct violation and abrogation of the Fourteenth Amendment of the United States Constitution." (Am. Compl. ¶ 39.) However, the Court, in its April 9, 2010 Memorandum and Opinion, rejected plaintiff's "media ride-along" claim:

> Plaintiff's allegations regarding the alleged 'media ride along' are conclusory and do not suffice to save plaintiff's claim. Aside from using the conclusory phrase 'media ride along' repeatedly throughout the amended complaint, plaintiff alleges no facts to bolster the theory that there was such a ride along. Specifically, plaintiff offers no allegations that suggest that the media ar-

rived in the same vehicles as the County defendants or that the media defendants even arrived at the same time as the County defendants.

*Young,* 705 F.Supp.2d at 200. Thus, the Court held that the very conduct that forms the basis of plaintiff's *Monell* claim did not occur in this instance. Finding no underlying constitutional violation to have been committed, the Court need not address the County's liability under *Monell.* *See Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

Even assuming *arguendo* that the absence of an underlying constitutional violation did not preclude a *Monell* claim in this case, the Court concludes that the County would still be entitled to summary judgment on that claim because of the absence of any evidence of an unconstitutional policy, practice, or custom by the County, or a failure to supervise or train, as it relates to the issues in this case.[12]

■ To the extent plaintiff now attempts to predicate her *Monell* claim on an alleged policy or practice of the County to conduct searches in violation of the Fourth Amendment, her claim also fails.[13] "It is well established that a party cannot

---

**12.** The Court notes that plaintiff's opposition papers fail to even point to any potential evidence of an unconstitutional policy, practice, or custom by the County defendants, or a failure by the County defendants to train or supervise their employees. Instead, plaintiff's papers merely recite the *Monell* standard, as well as the standards for establishing an unconstitutional "custom or practice" or an unconstitutional "failure to train or supervise" sufficient to survive summary judgment, without more. (*See* County Opp'n at 23–26.)

**13.** Because plaintiff's opposition papers merely recite the *Monell* standards, (*see id.*), it is not clear whether plaintiff attempts to alter her theory of *Monell* liability from what she originally pled in her amended complaint—from liability based on the alleged "media-ride-along" to liability based on the alleged violation of her Fourth Amendment rights. Because the County defendants contend, in their moving papers, that plaintiff might be attempting to raise this alternative theory of *Monell* liability, the Court briefly considers it here.

assert a claim for the first time in its motion papers." *Deskovic v. City of Peekskill,* 894 F.Supp.2d 443, 462 n. 27 (S.D.N.Y.2012) (citation omitted). Moreover, even assuming *arguendo* that plaintiff could assert a theory of *Monell* liability at this stage that she did not plead in her complaint, as discussed *supra,* the Court concludes that plaintiff has failed to set forth any evidence of the underlying constitutional violation, *see supra* Part III.A.1.b.ii.(2) (finding that, because the uncontroverted evidence shows that Mr. Young had apparent authority to consent to a search of the premises, both the Suffolk County police officers who entered and Delgado, who entered on behalf of the Suffolk County Department of Social Services, did not violate plaintiff's Fourth Amendment rights), and therefore no liability can exist under *Monell* pursuant to that theory. *See Segal,* 459 F.3d at 219.

### C. Young Defendants' Motion for Sanctions

The Young defendants move for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure on the following grounds: (1) plaintiff committed perjury; (2) plaintiff has "made a mockery of the Court system and has manipulated the Court system for years"; and (3) plaintiff has perpetrated a fraud upon the Court. (Young defs.' Mem. of Law in Supp. of Mot. for Sanctions at 1, 2, 8.)

■■■■ Under Rule 11, to avoid the risk of sanctions, a party's counsel must undertake reasonable inquiry to "ensure that papers filed are well-grounded in fact, legally tenable, and not interposed for any improper purpose." *Gal v. Viacom Int'l, Inc.,* 403 F.Supp.2d 294, 307 (S.D.N.Y. 2005) (internal quotation marks omitted) (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). In considering a motion for sanctions under Rule 11, this Court applies an "objective standard of reasonableness." *See MacDraw v. CIT Grp. Equip. Fin., Inc.,* 73 F.3d 1253, 1257 (2d Cir.1996) ("In evaluating whether the signer of a filing has violated Rule 11, the district court applies an objective standard of reasonableness; examining whether, under the circumstances of a given case, the signed has conducted a 'reasonable inquiry' into the basis of a filing."). "[R]ule 11 is violated only when it is patently clear that a claim has absolutely no chance of success." *Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986) (internal quotation marks omitted). Additionally, "[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable, . . . courts [must] resolve all doubts in favor of the signer" of the pleading. *Rodick v. City of Schenectady,* 1 F.3d 1341, 1350 (2d Cir.1993) (internal quotation marks omitted).

■■■■ The Court has no reason to believe that plaintiff knew at the time the lawsuit was filed that it was frivolous. For example, as noted *supra,* plaintiff appears to have believed that the Young defendants and Quatela conspired with the police and Delgado to unlawfully enter her home. She was not at home at the time of entry, so there is no basis to conclude that she knew such a claim was legally or factually false. Thus, there is insufficient basis to conclude that plaintiff's erroneous assertion of a conspiracy to unlawfully enter her home was made in bad faith. *See, e.g., Nesmith v. Martin Marietta Aerospace,* 833 F.2d 1489, 1491 (11th Cir.1987) (finding Rule 11 sanctions unwarranted and, in so doing, noting that "[t]he evidence [plaintiff] presented not only failed to indicate discriminatory treatment, but instead revealed that [plaintiff] received several salary increases and promotions during his tenure. [Plaintiff] made no showing that

other similarly situated members of the unprotected class were treated preferentially nor did he present evidence of retaliation. Under these circumstances, it is apparent that [plaintiff's] claim may be characterized as without foundation, but there is no evidence that he was in bad faith in bringing the claim, or that it was brought for any purpose other than to receive what he thought he was entitled to under the law."); *Grant v. Pfizer, Inc.,* 683 F.Supp. 41, 45 (S.D.N.Y.1988) ("While plaintiff did not succeed in coming forward with the evidence necessary to survive defendant's motion for summary judgment, her attorney's expectation that discovery would produce such evidence was neither unreasonable nor vexatious."). Thus, this Court finds that there is no basis to conclude that the lawsuit was filed in bad faith or was frivolous.

 Similarly, although plaintiff opposed the summary judgment motion even after discovery produced no evidence to support plaintiff's federal claims, the Court does not find such opposition to warrant an award of attorneys' fees. In the opposition, plaintiff cited the legal standard and attempted to raise disputed factual issues regarding the issue of state action and a lack of actual or apparent authority to consent. Although the Court determined that those arguments were without merit, the Court does not view plaintiff's opposition to have been submitted in bad faith or to otherwise warrant the award of fees. In essence, the Court concludes that plaintiff genuinely believed that there was an unlawful entry by the private parties with the police, and further believed that discovery would prove that theory. Although plaintiff was incorrect in her legal and factual beliefs, her erroneous assumptions do not rise to a level warranting sanctions.

In short, even though the basis for this lawsuit was extremely thin and plaintiff's unsuccessful opposition to the summary judgment motions were very weak, the Court does not believe attorneys' fees are warranted under the particular circumstances of this case. *See, e.g., Mareno v. Rowe,* 910 F.2d 1043 (2d Cir.1990) ("The positions advanced by [plaintiff] and his attorney, however faulty, were not so untenable as a matter of law as to necessitate sanction. Nor did they constitute the type of abuse of the adversary system that Rule 11 was designed to guard against."); *see also Scientific Components Corp. v. Sirenza Microdevices, Inc.,* No. 03 Civ. 1851(NGG) 2007 WL 1026411, at *5 (E.D.N.Y. Mar. 30, 2007) ("The court agrees that [the defendant] has been imprudent in choosing to litigate this claim. However, Rule 11 sanctions are not appropriate where there is a viable claim that is weak."); *Eisenberg v. Yes Clothing Co.,* No. 90 Civ. 8280(JFK), 1992 WL 36129, at *4 (S.D.N.Y. Feb. 19, 1992) ("Rule 11 sanctions are not to be imposed on every litigant that files a motion that the Court deems premature, or ill-advised, or weak."); *see generally Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421–22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (warning against the use of "hindsight logic" that "because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation").

### D. The Young Defendants' Counterclaims

The Young Defendants' answer to plaintiff's amended complaint also asserts state law counterclaims against plaintiff, for negligence and failure to preserve and maintain property. In her reply to the Young Defendants' answer and counterclaim, plaintiff argues that those counterclaims should be dismissed by the Court.

 Having determined, as discussed *supra,* that plaintiff's federal claims do not survive summary judgment, the

**398**

Court concludes that retaining jurisdiction over any state law claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06–CV–6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir.1986)).

Therefore, in the instant case, the Court, in its discretion, " 'decline[s] to exercise supplemental jurisdiction' " over the Young defendants' state law counterclaims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir.2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir.2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction against plaintiff over the remaining state law counterclaims given the absence of any federal claims that survive summary judgment, and dismisses such state counterclaims without prejudice.

IV. CONCLUSION

For the foregoing reasons, the Court grants the County defendants' motion for summary judgment, the Young defendants' motion for summary judgment, and Quatela's motion for summary judgment in their entirety. The Court denies the Young defendants' motion for sanctions. The Court also declines to exercise supplemental authority over the state law counterclaims and dismisses them without prejudice.[14] The Clerk of the Court shall close the case and enter judgment accordingly.

SO ORDERED.

---

**14.** Plaintiff's state law claims were dismissed at the motion to dismiss stage.